UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RYAN DOHMEN, an individual; CHARTER AIR
SOLUTIONS, LLC, a Montana company; TOP
FLIGHT CHARTERS, LLC, a Montana company;
and GLOBAL CROSSING AIRLINES GROUP, INC.,
a Delaware corporation,

        *Plaintiffs,*                           **CASE NO.:**

v.

SHORT'S TRAVEL MANAGEMENT, INC.,
an Iowa corporation; and STM CHARTERS, INC., an
Iowa corporation,

        *Defendants.*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL[1]

Plaintiffs, through undersigned counsel, file this Complaint and Demand for Jury Trial against Defendants, and state:

## INTRODUCTION

1.      Plaintiffs and Defendants compete in the air charter business. Dohmen previously worked for STM and its sister entity, STM-Charters. In 2004, Dohmen signed an agreement with STM that contained non-solicitation and confidentiality provisions. In 2023, Dohmen left Defendants after a demotion and dispute over unpaid compensation. Now, Dohmen and GlobalX want to partner in a new venture: Top Flight. Dohmen has not solicited any of Defendants' clients. Regardless, Plaintiffs maintain that non-solicitation restrictions are unenforceable under Iowa law.

---

[1] "**Plaintiffs**" means collectively (a) Ryan Dohmen ("**Dohmen**"), (b) Charter Air Solutions, LLC ("**Charter Air Solutions**"), (c) Top Flight Charters, LLC ("**Top Flight**"), and (d) Global Crossing Airlines Group, Inc. ("**GlobalX**").
"**Defendants**" means collectively Short's Travel Management Inc. ("**STM**") and STM Charters, Inc. ("**STM-Charters**").

2.      Dohmen has also not misappropriated any of Defendants' information, whether trade secret or not.

3.      Conversely, Defendants maintain that Dohmen is in violation of various contractual obligations and has stolen trade secrets. They have also spread the falsehood that Dohmen stole trade secrets and was embroiled in litigation in an effort to dissuade clients from doing business with him.

4.      Plaintiffs seek a declaratory judgment that the operative Agreement does not bar Dohmen from competing in the industry, that the Agreement's restrictive covenants are unenforceable under Iowa law, and that Defendants' alleged trade secrets do not exist and cannot have been misappropriated pursuant to the relevant trade secret statutes.

5.      Dohmen also seeks damages arising from Defendants' defamation *per se* based on numerous false statements they made about him in the marketplace.

## PARTIES

6.      Plaintiff Ryan Dohmen is a citizen of Flathead County, Montana.

7.      Plaintiff Charter Air Solutions, LLC is a Montana limited liability company with its principal place of business in Flathead County, Montana. It has no members in states other than Montana.

8.      Plaintiff Top Flight Charters, LLC is a Montana limited liability company with its principal place of business in Flathead County, Montana. It has no members in states other than Montana.

9.      Plaintiff Global Crossing Airlines Group, Inc., is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.  It a charter company with a fleet of passenger and cargo aircraft.

10.     Defendant Short's Travel Management, Inc., is an Iowa corporation with a principal place of business in Black Hawk County, Iowa. It is registered to do business, and does transact business, in the State of Florida.  It provides bus charters and facilitates group hotel bookings.

11.     Defendant STM Charters, Inc., is an Iowa corporation with its principal place of business in Black Hawk County, Iowa. It provides charter flights across the continental United States, including into Miami-Dade County.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interests, costs, and attorneys' fees, and is between parties of different states. 28 U.S.C. § 1332.

13.     This Court also has jurisdiction over Plaintiffs' claims for declaratory relief that arise under the Defend Trade Secrets Act of 2016 ("DTSA"). 28 U.S.C. §§ 2201 and 1331.

14.     This Court also has supplemental jurisdiction over Dohmen's state law claim as it is so closely related to his claim for declaratory judgment under the DTSA that it forms part of the same case or controversy. 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendants because they continuously conduct business within this District. Among other things, Defendants utilize airports and other facilities within this District to carry out their business.

16.     Venue is proper in this District because Defendant is subject to personal jurisdiction in this District and because the acts complained of herein occurred in this District. 28 U.S.C. § 1391.

**GENERAL ALLEGATIONS**

### A. *The Collegiate Athletics Air Travel Management Industry*

17.     Collegiate athletics is a multi-billion-dollar industry. In 2022, over 20 universities, nearly all of which are public institutions, earned more than $150 million each in revenue from their athletic programs.

18.     To generate that type of money, student athletes and athletics staffs travel all over the country for inter-collegiate sporting events and related events. The logistics of such travel requires chartered planes.

19.     A subset of the charter airline industry has emerged to compete for that business.

20.     There are only a handful of players in this space.  Most act as brokers: They contract with carriers (owners of planes), on the one hand, and university representatives, on the other.

21.     Contracts are often not with a university writ large, but with a specific sports program. During a single academic year a school may utilize one air charter entity for football, another for women's basketball, and a third for baseball.[2]

22.     There are no secrets in this business. Collegiate athletics air charter companies advertise the colleges they work with. Universities do the same regarding their current air charter providers.

23.     Obtaining contracts is straightforward: Jobs are awarded overwhelmingly by bid. University decision makers are well known and easily accessible. The preeminence of price (not to mention public records laws) means that the process is transparent amongst competitors.

---

[2] This is true even of schools that have signed global travel management deals with 'travel management entities' such as STM. In other words, even if STM has a global travel management deal with a school, there is no guarantee that it will provide air charter for any of that university's athletics programs.

24.     Given the nature of this market, it is unsurprising that collegiate athletics air charter contracts are (i) short term (usually no longer than the duration of a season or academic year), (ii) easily terminable by a university, and (iii) contain industry standard terms.

### B. *Dohmen's Tenure with Defendants*

25.     Dohmen joined STM in June 2004 as a charter pilot. In connection with his hiring, Dohmen signed a Confidentiality and Noncompetition Agreement ("Agreement"). *See* July 27, 2023 Cease and Desist Letter, attached hereto as Composite Exhibit "A" at 4.  Despite its title, the Agreement's post-employment restrictions ("**Restrictive Covenants**") do not include a non-competition provision. Rather, they include only confidentiality and non-solicitation provisions. *Id.*

26.     In 2005, Dohmen transitioned to sales.

27.     In 2007, Dohmen began managing a department dedicated solely to regular season collegiate athletic air charters.

28.     In 2008, for liability purposes, STM created a separate entity, STM-Charters, to handle its air charter services.

29.     In 2012, Dohmen was named President of STM-Charters. His compensation was a blend of salary and percentage of profitability. Despite his change in employer, he was not asked to, nor did he, execute a new agreement that contained restrictive covenants with STM-Charters.

30.     From approximately 2012-2017, Defendants exited the collegiate athletics air charter business, and focused instead on corporate air charters.

### C. *Dohmen Resigns*

31.     On October 12, 2022, Plaintiff had a meeting with Defendants' CEO (David LeCompte), and CFO (Shauna Basile). Dohmen was told that his compensation structure would

remain the same but that he would no longer lead STM-Charters and that his new roles and responsibilities would be defined at a later date.

32.     In early January 2023, Dohmen sent Defendants his initial proposal regarding his compensation structure and responsibilities.

33.     On January 13, 2023, Mr. LeCompte, on behalf of Defendants, responded with a counter that was materially different than what Dohmen had proposed. It also (contrary to the representations of Defendants' CEO and CFO on October 12, 2022) was materially different than the compensation structure and responsibilities of Dohmen while he was President of STM-Charters.

34.     On January 16, 2023, Dohmen received a DocuSign invite from STM's human resources department. Dohmen was told that he needed to sign a new, highly restrictive non-competition and non-solicitation agreement. In exchange, it was claimed that he would receive a bonus for 2022 paid out over the following two years. His compensation was otherwise greatly reduced. Dohmen refused to sign the document.

35.     On February 3, 2023, Dohmen provided his resignation and a two-week notice. Members of management immediately began calling Dohmen's clients and vendors to paint Dohmen as doing something wrong, defaming him in the process.

### D.  *Events Following Dohmen's Separation from Defendants*

36.     Since leaving Defendants, Dohmen set up two entities in Montana—Top Flight and Air Charter Solutions.

37.     Charter Air Solutions and Top Flight have only been contracted for a handful of trips since their inception, none of which were based on Dohmen's solicitations.

38.     Dohmen and GlobalX intend to partner through Top Flight in order to provide collegiate athletics air charter travel.

39.     Setting aside the lack of enforceability of the Restrictive Covenants, Dohmen has not solicited anyone that he worked with in the two years prior to his resignation.

40.     Nor has Dohmen used or shared any information that could be considered proprietary, confidential, or trade secrets in connection with bidding trips.

41.     As a testament to the open nature of the industry, numerous members of STM-Charters have repeatedly—and with the blessing of Defendants' CEO—asked Dohmen for quotes on trips.

42.     Further, since leaving, Dohmen has worked with GlobalX in an attempt to provide STM-Charters with a dedicated aircraft for the upcoming season.

### E.   *Defendants' Attempts to Destroy Dohmen's Reputation*

43.     In July 2023, STM sent a cease and desist to Dohmen and GlobalX. Therein, STM claimed Dohmen was violating his Restrictive Covenants by "soliciting, communicating, and working with [STM's] clients by quoting GlobalX through other various brokers." Ex. A at 2.

44.     Defendants—through their CEO and otherwise—have also falsely claimed to GlobalX:

> a.   that Dohmen sent an unauthorized loan of $10,000,000 to Elite Airways while STM was working with them.
>
> b.   Dohmen had lost the Defendants $1,500,000 in 2022. This was a blatant lie, as Dohmen netted STM Charters a substantial gain in 2022.
>
> c.   Has misappropriated trade secrets.

45.     Additionally, in recent weeks, representatives of STM-Charters have told carriers that they should not provide quotes to Dohmen or provide him with any information that will assist him in bidding jobs.

## COUNT I
## DECLARATORY JUDGMENT – RESTRICTIVE COVENANTS UNENFORCEABLE
(All Plaintiffs Against All Defendants)

46.     Plaintiffs repeat and reallege Paragraphs 1-45 as if fully set forth herein.

47.     A dispute exists between Plaintiffs and Defendants regarding the enforceability of the Restrictive Covenants.

48.     There exists an actual controversy that flows from Defendants' assertion that Dohmen is bound by the Restrictive Covenants such that his fair competition is prohibited.

49.     All parties' legal rights, powers, and duties depend upon a declaration by this Court.

50.     All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

51.     Neither the controversy nor the facts upon which it is based are hypothetical. The parties have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the enforceability of the Restrictive Covenants will immediately clarify the parties' respective rights, powers, and duties.

52.     The Restrictive Covenants constitute unlawful restraints of trade as they are neither supported nor necessary to protect any legitimate business interests. Instead, they are unreasonably restrictive and prejudicial to the public interest.

53.     There is no confidential, proprietary, or trade secret information that confers a benefit upon Defendant by not being generally known. The industry is wide open. Contracts are standardized. Competitors work with one another frequently.

54.     Any successes that Plaintiffs have in the market is not attributable to an unfair advantage, but by beating Defendants on the merits. The Restrictive Covenants merely serve to prevent competition *per se*, rendering them unenforceable as a matter of law.

55.     Plaintiffs seek a declaration that the Restrictive Covenants are unenforceable as a matter of law.

**COUNT II**
**DECLARATORY JUDGMENT – RESTRICTIVE COVENANTS DO NOT BAR**
**COMPETITION *PER SE***
(All Plaintiffs Against All Defendants)

56.     Plaintiffs repeat and reallege Paragraphs 1-45 as if fully set forth herein.

57.     A dispute exists between Plaintiffs and Defendants regarding the scope of the Restrictive Covenants.

58.     There exists an actual controversy that flows from Defendants' assertion that the Restrictive Covenants preclude Dohmen's fair competition.

59.     All parties' legal rights, powers, and duties depend upon a declaration by this Court.

60.     All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

61.     Neither the controversy nor the facts upon which it is based are hypothetical. The parties have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the scope of the Restrictive Covenants will immediately clarify the parties' respective rights, powers, and duties.

62.     Missing from the Agreement is a provision that bars Dohmen from competition with Defendants. As a result, the Restrictive Covenants cannot be used to preclude Dohmen's competition, individually or through other entities.

63.     For example, brokers (including Defendants) have reached out to Dohmen about chartering flights. Quoting a rate to a broker who reaches out to him does not violate the Restrictive Covenants as written.

64.     Plaintiffs seek a declaration that the Restrictive Covenants do not prohibit Dohmen from competing with Defendants or quoting a rate or otherwise working with brokers who request such a quote.

**COUNT III**
**DECLARATORY JUDGMENT – PLAINTIFFS HAVE NOT MISAPPROPRIATED TRADE SECRETS**
(All Plaintiffs Against All Defendants)

65.     Plaintiffs repeat and reallege Paragraphs 1-45 as if fully set forth herein.

66.     A dispute exists between Plaintiffs and Defendants regarding whether Dohmen has misappropriated any of Defendants' trade secrets as defined by the **DTSA**, 18 U.S.C. § 1832; the Iowa Uniform Trade Secret Act ("**IUTSA**"), IA Stat. §550.2; or the Montana Uniform Trade Secret Act ("**MUTSA**"), MT ST. 30-14-402.

67.     There exists an actual controversy that flows from Defendants' assertion that misappropriation of trade secrets has occurred. Defendants claim that Plaintiffs—through Dohmen and otherwise—misappropriated confidential information that constitutes trade secret information.

68.     Plaintiffs have a reasonable apprehension of being named as defendants in a trade secret misappropriation lawsuit.

69.     All parties' legal rights, powers, and duties depend upon a declaration by this Court.

70.     All parties with any interest in the declaration sought are before this Court and will have an opportunity to respond.

71.     Neither the controversy nor the facts upon which it is based are hypothetical. The parties have a concrete controversy that is susceptible to conclusive judicial determination given

that a declaration regarding the lack of misappropriation of trade secrets will immediately clarify the parties' respective rights, powers, and duties.

72.     Dohmen, GlobalX, nor any other Plaintiff has obtained, let alone used, anything that could possibly constitute Defendants' trade secrets. This includes the list of items generically described by Defendants, i.e., a "sales systems, sales methods, pricing, bidding, costs, client identity, location, system and service requirements, or charges." Ex. A at 1.

73.     None of this information constitutes a trade secret as none of it (a) derives an independent economic value from being kept secret and is readily ascertainable, (b) Defendants failed to make reasonable efforts to maintain its secrecy (nor could they given the nature of the business).

74.     Even if such material could constitute Defendants' trade secrets, neither Dohmen, nor GlobalX, nor any other Plaintiff, has engaged in the misappropriation of it, through acquisition or disclosure (as those terms are defined by the DTSA, IUTSA, and and/or the MUTSA).

75.     Accordingly, Plaintiffs seek a declaration that have not misappropriated any trade secret within the meaning of the DTSA, IUTSA, or MUTSA.

**COUNT IV**
**DEFAMATION *PER SE***
(Plaintiff Dohmen Against All Defendants)

76.     Plaintiff Dohmen realleges and incorporates by reference paragraphs 1-45 as if fully set forth herein.

77.     Defendant made the following statements to market actors, including to Dohmen's former and prospective colleagues as well as former and prospective clients:

   a.   That Dohmen sent an unauthorized loan of $10,000,000 to Elite Airways while STM was working with them.

   b.   That Dohmen lost the Defendants $1,500,000 in 2022.

11

    c.    That Dohmen misappropriated Defendants' trade secrets and was violating enforceable restrictive covenants.

    d.    That market actors should not do business with Dohmen or provide him with any information that will assist him in bidding jobs.

78.    Again: This was done *as Defendants were asking Dohmen for bids*.

79.    Defendants' statements are defamatory *per se* because, even when considered alone, they tend to subject Dohmen to distrust, ridicule, contempt, and disgrace and are injurious to his professional reputation. Further, considered alone, they impute to Dohmen criminal offenses and conduct and characteristics incompatible with the proper exercise of his lawful profession or office.

80.    These statements were aimed at harming Dohmen's fitness in his profession and his moral character.

81.    At the time they made these statements, Defendants knew or should have known that the statements would cause severe damage to his personal and professional reputation, business opportunities, career, and ultimately his ability to earn a living.

82.    Defendants made the foregoing statements with actual malice because they either knew of their falsity or made the statements with reckless disregard for their truth or falsity.

83.    Defendants knew that these statements were false when publishing them or, at minimum, had no reason to believe that they were true upon publication, thereby destroying any privilege on which Defendants could rely.

84.    In making the defamatory statements, Defendants acted intentionally, maliciously, willfully, and with the intent to injure Dohmen.

85.     Dohmen has been harmed by the diminished economic value of (1) the goodwill he built over many years in the relevant marketplace and (2) his long-standing reputation as an honest, ethical, reliable, and hard-working individual.

86.     Defendants' statements wrongfully paint Dohmen as unprofessional, untrustworthy, immoral, criminal, and unfit for employment in the relevant industry.

87.     Defendants were grossly negligent because their behavior entailed a conscious disregard and indifference to the truth and Dohmen's rights. Defendants engaged in intentional misconduct because they had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the Dohmen would result. Despite that knowledge, Defendants intentionally pursued its course of conduct resulting in injury and damage to Dohmen. Defendants' conduct was unreasonable and outrageous, exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately to cause Dohmen severe harm. Consequently, Dohmen is also entitled to and seeks punitive damages.

88.     As a result of Defendants' defamatory statements, Dohmen has been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

Plaintiffs request the Court enter judgment in their favor and award the following:

a.  A declaration that the Restrictive Covenants are unenforceable as a matter of law; or, alternatively, a declaration that the Restrictive Covenants do not preclude Dohmen from competing with Defendants and/or responding to requests for a price quote;

b.  A declaration that Defendants do not have trade secrets, or, that Plaintiffs have not misappropriated Defendants' trade secrets if the Court determines such trade secrets exist;

c.  Costs and reasonable attorneys' fees;

d.  Pre-judgment and post-judgment interest; and

e.   Such other relief this Court deems just and proper.

In addition to the above sought relief, Plaintiff Dohmen requests the Court enter judgment

in his favor and award the following:

a.   Presumed, actual, compensatory, and punitive damages for Defendants' defamatory *per se* statements to the fullest extent permitted by law;

b.   Pre-judgment and post-judgment interest; and

c.   Such other relief this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues that are triable to a jury.

Dated: August 11, 2023                                    Respectfully submitted,

By*: /s/ Christopher S. Prater*
        Jonathan E. Pollard
        Florida Bar No.: 83613
        jpollard@pollardllc.com

        Christopher S. Prater
        Florida Bar No.: 105488
        cprater@pollardllc.com

        **Pollard PLLC**
        401 E. Las Olas Blvd., Ste. 1400
        Fort Lauderdale, FL 33031
        Telephone: (954) 332-2380
        *Attorneys for Plaintiffs*